965 So.2d 574 (2007)
James Carey PAHAL, Plaintiff-Appellee
v.
Debra Lynn TAYLOR, Pahal Sepulvado, Defendant-Appellant.
No. 42,698-CA.
Court of Appeal of Louisiana, Second Circuit.
August 29, 2007.
*575 McKeithen Law Firm, by Anita D. McKeithen, Shreveport, for Appellant.
Thomas Norman Thompson, Shreveport, for Appellee.
Before PEATROSS, DREW and LOLLEY, JJ.
DREW, J.
In this child custody matter, Debra Sepulvado appeals a judgment denying her request to be named domiciliary custodian of her 16-year-old son. We affirm the ruling of the learned trial court.

FACTS
James Pahal ("Pahal") and Debra Sepulvado ("Sepulvado") were married in 1988. In November of 1990, Sepulvado, who was six months pregnant, left Pahal and moved in with a high school boyfriend, who had been released from prison[1] that same month. In November of 1991, these parents each sought custody of their son, M.P.,[2] born in January of 1991.
Following a contested hearing, the trial court:
 granted joint custody, with Pahal designated as the domiciliary custodian;
 stated that it was in the best interests of M.P. for his father to be the domiciliary parent because of Sepulvado's affair with a twice convicted felon, a better opportunity for timesharing, Sepulvado's lack of credibility, Pahal's commitment to providing religious education for his son, and Pahal's better family support.[3]
On appeal, this court found no error in the awarding of domiciliary custody to Pahal. Pahal v. Pahal, 606 So.2d 1359 (La. App. 2d Cir.1992).
Because of non-traditional work schedules, the Joint Custody Implementation Plan ("JCIP"), was somewhat complicated:
 Sepulvado had physical custody of M.P. every other weekend from noon on Friday to noon on Monday.

*576  On non-visitation weekends, she had physical custody on Monday from 9:00 a.m. to 8:00 p.m. if Pahal's work required him to be out of town on that day.
 On visitation weekends, Pahal was permitted to have custody of M.P. for a few hours on Sunday to take him to church for morning and evening services.
 In addition to physical custody during holidays, each party was to have three weeks of uninterrupted visitation during the summer.
 This court calculated that Sepulvado had approximately 125-135 days of physical custody per year under the JCIP.
Several amendments were made to the JCIP by this court in the 1992 appeal. Sepulvado had requested six weeks of physical custody during the summer and at all times when Pahal was out of town. In order to give the parties a more equal sharing of physical custody, this court amended the plan to give Sepulvado six weeks of physical custody during the summer, with Pahal having two weekends of visitation during this period.
This court also amended the JCIP to afford Sepulvado the opportunity to take M.P. to morning and/or evening church services on Sundays when she had physical custody, with the requirement that she notify Pahal of her intent to do so before noon of the preceding Friday.
On October 9, 2002, the trial court increased Sepulvado's child support.
It also modified the JCIP as per agreement by the parties:
 During the school year, Sepulvado had physical custody of M.P. on every other weekend from 5:00 p.m. on Friday to Sunday at 5:00 p.m.
 If she did not plan to take M.P. to church, then she was to inform Pahal of this by noon on Saturday, and then he could pick up M.P. at 9:00 a.m. on Sunday and return him later that day at 1:00 p.m.
 During the summer, weekend visitation was suspended, and Sepulvado was to have uninterrupted physical custody for five consecutive weeks beginning the Monday after Father's Day.
 Although weekend visitation would not resume until the weekend after school started, M.P. could request weekend summer visitation.
On November 15, 2005, the mother filed a rule for change of custody, alleging that she should be designated as the domiciliary parent because Pahal had neglected to get and refused to pay for medical treatment for M.P., and because M.P. wanted to live with his mother.
On January 17, 2006, the father responded by filing a rule requesting:
 allocation of non-covered healthcare expenses,
 increased child support,
 modification of the JCIP concerning custody of M.P. during the 4th of July holiday, and
 transportation of M.P. by the party with physical custody.
Following a hearing on the rules, the trial court maintained Pahal as the domiciliary parent.
However, the court wisely ordered that:
 Each party timely provide the other with all dental, medical, and school information either receives about their son.
 Sepulvado be listed on his school records as M.P.'s mother and as an additional person allowed to pick him up.

*577  M.P. be allowed to have a cell phone provided by his mother while at his father's, by which to communicate with his mother,[4]
 Pahal to have physical custody of M.P. every Sunday from 9:00 a.m. to 1:00 p.m. for morning church services, and from 30 minutes before and 30 minutes after Sunday evening church services.
 Sepulvado to have physical custody of M.P. on every other weekend from 5:00 p.m. on Friday to 8:00 a.m. on Monday. If this schedule is disrupted by the holidays, then her weekend visitation would resume on the first weekend she is off work after the holidays.
 Sepulvado to have physical custody of M.P. on every other Wednesday from 5:00 p.m. until Thursday at 5:00 p.m. beginning on February 14, 2007, and on every other Tuesday from 5:00 p.m. until Wednesday at 5:00 p.m. beginning on February 21, 2007.
 Physical custody of M.P. is to be alternated for the Spring Break, 4th of July and Labor Day holidays.
 Sepulvado is not to allow M.P. to have access to mature-rated video games while he is at her home.
The trial court denied any additional modification of the JCIP, increased Sepulvado's child support obligation, allowed Pahal to declare M.P. as a dependent on his income tax returns, and ordered each party to bear a portion of M.P.'s necessary and noncovered dental, medical, orthodontic and ophthalmic expenses.

DISCUSSION
Sepulvado contends on appeal that the trial court erred in failing to modify custody to designate her as the domiciliary parent. She further contends that the Bergeron standard for changing a considered custody decree should not be applied in this case. She has not asked us to alter the visitation schedule.
When a trial court has made a considered decree of permanent custody, the party seeking a change in custody bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986). A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. Oglesby v. Oglesby, 25,974 (La.App.2d Cir.8/17/94), 641 So.2d 1027.
Because the 1991 judgment naming Pahal as domiciliary parent was a considered decree, the Bergeron standard was properly applied by the trial court in the most recent litigation in this case, and we find no clear error in the trial court maintaining Pahal as the domiciliary parent.
Sepulvado's primary evidence in support of a modification of custody is that M.P., who is now 16 years old, asked her to request the change. M.P. wants to live with his mother because he wants to spend more time with her, and because Pahal does not allow him to visit his mother whenever he wishes. M.P. believes that if he lived with his mother, then she would permit him to visit his father at any time that he wanted. Sepulvado would be open to allowing M.P. to visit his father whenever he wanted. M.P. also stated that he believed that his life would be easier for him if he lived with his mother because then he would not have to do as much *578 work around the house as he does with his father, one example of which was helping his father put a roof on their house. M.P. added that he was not implying that his mother allows him to do what he wants, as she disciplines him, expects him to keep his room clean, and makes him go to sleep at a reasonable hour. Because his mother only lives about four miles from his father, he would attend the same school and even ride the same bus to school, even with a change in custody.
In most respects, Sepulvado has gotten her life in order since Pahal was awarded domiciliary custody. She graduated from nursing school in May of 2006 and works at Minden Medical Center, though her work schedule is not always harmonious with her visitation schedule. Her marriage to the ex-convict ended after nine years, and she has been married to her current husband for six years.
Still, Sepulvado has exhibited poor judgment in recent years:
 She allowed two cousins who were known drug users to live with her. While her efforts to help her cousins straighten out their lives is commended, it was not in M.P.'s best interest to expose him to the cousins. It is noted that the cousins are no longer welcome in her home, and that she even filed charges against them after they apparently took some money from her and used a family vehicle without permission.
 She has not always ensured that M.P. remained in her presence when she had physical custody of him. During the Summer of 2005, she allowed M.P. to go on a week-long trip to the Midwest without her but with a family friend whom Pahal knew little about. Pahal stated that he did not know how to contact M.P. during the trip, and that he never heard from M.P. during the trip. Sepulvado has, during her visitation period, allowed M.P. at times to stay with her sister.
 Sepulvado's husband Christopher used poor judgment involving M.P. He twice allowed M.P., when he was 12 or 13, to ride in the back of his pickup truck, which Christopher did not think was unsafe. He has also twice let M.P., who at the time had not taken a hunter safety course, to be in a deer stand with a loaded rifle and another youth with no adult present. Christopher saw nothing wrong with this.
 There was abundant testimony about an incident involving some "Mature" rated video games belonging to Christopher. These games were kept next to a television in the living room, and on one occasion when M.P. was hurriedly packing his games for a church sleep over, he inadvertently put these violent games into his backpack. When Pahal found out, he removed the games from M.P.'s backpack, which prompted Sepulvado to call the police in order to retrieve them. M.P. stated that he has never played these games because he knew it was not allowed. Preventing access to these games was addressed by the trial court.
In his effort to undermine Sepulvado's case, Pahal places great emphasis on a clothed "lap dance" that Sepulvado performed in 2001 in her home for the benefit of twin brothers who were apparently celebrating their 18th birthdays. The dance was documented by several photos, which show, among other things, Sepulvado's thong. What alarms this court is not only that Sepulvado performed the dance, but also that her six-year-old son was present in the room at the time, and that she found nothing unusual about her younger son seeing his mother "play." She also did not *579 think it would be inappropriate for M.P. to see her now acting in that manner.
M.P. is a well-adjusted young man who has thrived while his father has been the domiciliary custodian. On the other hand, this court cannot consider Pahal's conduct to always be in the best interests of M.P. Pahal, a railroad employee, is a stickler for the letter of the JCIP, and is not in the habit of being flexible when the realities of life collide with the visitation schedule set forth in the JCIP. This record indicates he based his lack of cooperation on a rigid interpretation of the visitation schedule when common courtesy would have resulted in Pahal's compromising occasionally.
M.P. feels that his mother would be the more flexible of his parents. We agree, but the Bergeron case applies here, and we cannot say the trial court was clearly wrong in its application of this landmark jurisprudence.
When Sepulvado completed her nursing studies, it was marked by a graduation ceremony and a pinning ceremony that were to take place when M.P. was not in her physical custody. Pahal allowed M.P. to attend the pinning ceremony, but would not allow his attendance at her graduation because he would miss school, even though the record shows that he had good grades and probably would not have suffered academically had he been allowed to attend this milestone event. M.P. also was not allowed to eat with Sepulvado's family in celebration of her graduation.
Pahal also refused to allow M.P. to attend a family dinner organized for M.P.'s uncle before deployment to Iraq. When Sepulvado called Pahal to ask if her brother could see M.P. to tell him goodbye, Pahal responded that M.P. was unavailable because he was at a friend's home, when, in fact, he was with his paternal grandparents who lived next door to Pahal. Thankfully, the grandparents allowed the meeting.
Sepulvado also complained that Pahal was unreasonably inflexible when her work schedule over the holidays interfered with her visitation schedule. She asserted that when she approached Pahal about an adjustment, and even offered to give Pahal two weekends with M.P. in a row as an inducement to be flexible, he refused and said he was adhering to the JCIP. Pahal agreed that he told Sepulvado that they would comply by the papers, but he explained that the holidays always throw the weekend schedules off and they had never had to make the adjustment in the past. He also denied that Sepulvado offered him two consecutive weekends.
In these and countless other ways, large and small, Pahal has done his dead level best to frustrate M.P.'s relationship with his mother. Every child should have easy, relaxed access with both parents, even if they are divorced. M.P. has been denied this. Pahal simply has not taken the minimal steps necessary to include Sepulvado as an active participant in M.P.'s life:
 She is not listed as his mother on M.P.'s school records, although Pahal's wife of 12 years is listed as his step-mother.
 She is not listed as an emergency contact or someone allowed to pick up M.P. from school.
 If M.P. is ill, she only hears about it from her other son, who rides the same bus, or if she happens to call M.P.
Somehow, someway, M.P.[5] has turned out to be a fine young man, despite the bickering of his parents. It is amazing *580 how resilient young people can be, even when reared by two immature parents, one who lacks judgment, and the other who behaves like a tyrant, schedule-wise, when life doesn't, and shouldn't, operate like that.
A wonderful opportunity for cooperation has been squandered, with the parties living only four miles apart, in the same school district. Hopefully, the remainder of time during which these parties are bound by the visitation schedule can be marked by a concerted effort on the part of both parents to cooperate with M.P. and each other so that his parents can participate as fully as possible in the remainder of his childhood.

CONCLUSION
We hold that the Bergeron standard applies to the instant litigation, and that the trial court was not clearly wrong in refusing to change the domiciliary status of the parents. Although the son desires that his mother now take that role, the court is not bound to abide by his wishes alone. The trial court was not clearly wrong in maintaining Pahal as the domiciliary custodian of M.P.
The trial court took great pains in tweaking the visitation schedule to foster more contact between M.P. and his mother. Sepulvado's job schedule made this difficult. She works an 11:00 a.m to 11:00 p.m. shift on a rotation of two days on, two days off, two days on, two days off, then three days on, three days off. Pahal's job schedule with Kansas City Southern Railroad is more regular, as he is off on evenings and weekends.
Our preference, with a child this age, would be to keep things simple and responsive to the reality of M.P.'s teenage years. That apparently not being possible, we conclude that the learned trial court's visitation schedule is the best it can be under the circumstances. It is obvious that our brother judge below struggled mightily to make the most out of a messy and distasteful situation. We urge these parents, during the last 17 months of this young man's childhood, to look in the mirror. She needs to continue growing up, and he needs to have a heart, not a piece of paper.
Sepulvado has not asked us to revisit the visitation schedule, only that she be named the domiciliary parent. Under the facts of this case, we are not able to accommodate this request.

DECREE
With each party to bear their own costs, the judgment is AFFIRMED.
NOTES
[1] A second felony offender.
[2] Initials are used in lieu of the child's name.
[3] His parents lived next door to him.
[4] With the proviso that the phone is to be turned off at 9:00 p.m. on school nights.
[5] Now sixteen and one-half years old.